# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.

NANCY PERALES,

      Plaintiff,

  v.

DISH NETWORK L.L.C., a Colorado limited liability company,

      Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Nancy Perales ("Plaintiff"), by and through her attorneys, HKM Employment Attorneys, LLP, for her Complaint and Jury Demand against Defendant DISH Network L.L.C. ("DISH," the "Company," or "Defendant"), states and alleges as follows:

## PRELIMINARY STATEMENT

1.    This is a discrimination case arising from Defendant's discrimination toward Plaintiff on the basis of her sex. Over the course of Plaintiff's employment with Defendant, Defendant displayed a pattern of discriminatory treatment toward Plaintiff and other female employees, routinely holding Plaintiff to disparate performance standards and denying her opportunities for advancement because of her sex. Ultimately, Defendant disparately applied Company policy to Plaintiff as compared to male employees to justify Plaintiff's termination, while retaining several male executives who engaged in the same alleged violation of Company policy.

1

2.    Plaintiff was the head of Defendant's internal creative agency, OneTen Creative. Throughout Plaintiff's tenure with Defendant, she was an incredibly successful and high-performing employee, growing OneTen Creative from a small, 20-person group to a large agency that created everything from digital ads to television spots. Even so, Plaintiff received only one promotion during her tenure with Defendant, while less qualified male employees were promoted ahead of her.

3.    Based on Plaintiff's observations and those shared with her from other female employees working for Defendant, Defendant's human resources department was recognized as being untrustworthy and ineffective, especially when it came to reports of less favorable treatment based on sex and other issues affecting female employees, such as maternity leave and accommodations for pregnancy-related illness. For example, on many occasions, Plaintiff witnessed Defendant's human resources department fail to hold male employees accountable for egregious violations of Company policy, including verbally assaulting female employees, holding female employees back from promotions, and engaging in offensive behaviors toward female employees. The policy-violating behaviors of these male employees were routinely dismissed and ignored, and even the most egregious violators were given the opportunity to correct their behavior through a performance improvement plan or performance coaching, rather than being terminated.

4.    In or around April 2022, one of Plaintiff's direct reports, Lizzy Bakhaus, informed Plaintiff that a male colleague, Steve Molnar, had made an inappropriate comment during a team meeting, though she clarified to Plaintiff that she was "not personally offended" by the comment. Plaintiff reported the comment to her then-supervisor, Larry Frankel, who told Plaintiff not to

report the comment to human resources, because he wanted to speak to Mr. Molnar and Ms. Bakhaus himself, rather than reporting the comment to human resources.

5.      Several months later, after Mr. Frankel departed the Company, Plaintiff also discussed Mr. Molnar's comment with her new supervisor, Kurt Simon. Mr. Simon also did not instruct Plaintiff to report the comment to Defendant's human resources department, nor did Mr. Simon do so himself.

6.      Nearly a year after Mr. Molnar's inappropriate comment occurred, Defendant's human resources department began investigating Plaintiff for supposedly violating the Company's self-styled "Equal Employment Opportunity (EEO) Policy." Shortly thereafter, Defendant terminated Plaintiff's employment because Plaintiff reported Mr. Molnar's comment to her two direct supervisors, as opposed to Plaintiff reporting the comment directly to human resources herself *as well as* reporting it to the two direct supervisors she had since Mr. Molnar's comment had occurred. Though male employees, including Mr. Simon, were likewise aware of the comment and had failed to follow Defendant's EEO Policy in reporting it to human resources, no male employee was disciplined or terminated as a result of their failure to report Mr. Molnar's inappropriate comment.

7.      In other words, Defendant subjected Plaintiff to disparate terms and conditions of employment on the basis of her sex, and ultimately terminated her employment because she is a woman.

## **PARTIES**

8.      Plaintiff is, and at all times relevant to this Complaint was, a resident of Colorado.

9.      At all times relevant, Defendant DISH Network L.L.C. was a Colorado limited liability company with a principal office street address located at 9601 S Meridian Boulevard, Englewood, Colorado 80112.

## JURISDICTION AND VENUE

10.      Plaintiff incorporates by reference the above paragraphs as though set forth separately and fully herein.

11.      This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the employment practices and other conduct alleged to be unlawful occurred in this District.

## ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED

13.      Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

14.      Plaintiff filed Charge of Discrimination Number 32A-2024-00297 with the Equal Employment Opportunity Commission (EEOC) against DISH Network Corporation on or about January 5, 2024 for discrimination based on sex (Plaintiff's "Charge").

15.      As outlined in Defendant DISH Network L.L.C.'s Position Statement provided in response to Plaintiff's Charge, DISH Network Corporation is Defendant DISH Network L.L.C.'s parent company. Defendant DISH Network L.L.C. received notice of Plaintiff's above-referenced Charges of Discrimination, as evidenced by Defendant's Position Statement, which explicitly provides a response on behalf of Defendant DISH Network L.L.C. The intention that DISH

Network L.L.C. receive notice of Plaintiff's Charge of Discrimination and that it had an opportunity to attempt conciliation concerning the same has therefore been satisfied.

16.    The EEOC issued Plaintiff a Notice of Right to Sue on the above-referenced Charge on August 29, 2024, and Plaintiff has filed the present action within ninety (90) days of receipt of same.

17.    Plaintiff has met all administrative prerequisites prior to filing this action.

## FACTUAL ALLEGATIONS

18.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

19.    Plaintiff began working for Defendant as the General Manager of OneTen Creative on or about February 2, 2015.

20.    Prior to being hired by Defendant, Plaintiff worked for STARZ Entertainment for approximately eight years, where she was promoted from Creative Director to Vice President and led a full service in-house creative team developing advertising and marketing materials for STARZ, Encore, and other networks.

21.    Prior to working for STARZ Entertainment, Plaintiff spent approximately three years as an Account and Creative Director for a creative agency, and before that she was the Director of Branding and Director of Marketing Communications for AT&T Broadband.

22.    In short, Plaintiff was highly qualified for her position with Defendant.

23.    OneTen Creative ("OneTen") is an in-house creative and design agency that sits within Defendant's marketing department. As OneTen's General Manager, Plaintiff was

responsible for building, growing, and managing what was initially a team of 20 employees to deliver creative work for Defendant.

24.     Under Plaintiff's leadership, the OneTen team grew to more than 50 employees, working across every area of the Company to provide creative work ranging from digital marketing ads to television spots to print materials.

25.     Plaintiff at all times met or exceeded the Company's legitimate performance expectations.

26.     In 2016, Plaintiff earned a nomination for Climb leadership training, which put her on the path to becoming a Director.

27.     Defendant told Plaintiff that before she could be promoted to a Director-level role, she was required to successfully complete both Defendant's "Climb" and "Base Camp" training programs.

28.     Plaintiff successfully completed both programs in 2016, yet she was not promoted to Director for nearly another two years.

29.     In 2018, Plaintiff earned a promotion to a Director-level role, and she was recognized by the DISH Women's Network as a "Woman to Watch."

30.     In Defendant's Position Statement provided in response to Plaintiff's Charge (the "Position Statement"), Defendant states Plaintiff "received various advancements" during her employment with Defendant.

31.     However, despite the consistent success OneTen experienced under Plaintiff's leadership, Plaintiff's promotion to Director in 2018 was the only promotion Plaintiff received during her eight-year tenure with Defendant.

32.     During Plaintiff's employment, Plaintiff's advancement within Defendant's organization was impeded, because she was assigned to report to a less qualified and/or less tenured male employee who was not qualified to oversee Plaintiff's team.

33.     For example, in 2016, Defendant promoted Fuad Hamza, the Director of Brand Marketing and the General Manager of Marketing, to oversee OneTen, including assigning Plaintiff to report to Mr. Hamza. Mr. Hamza had no experience managing a creative agency, in comparison to the more than fifteen years of creative agency experience Plaintiff had at that time.

34.     The requirement that Plaintiff report to Mr. Hamza constituted a demotion for Plaintiff, as the reassignment added another layer of management above Plaintiff's position, in addition to blocking Plaintiff from being promoted to a Director-level position herself, as she was now reporting to someone at the Director level.

35.     Plaintiff was only considered for a promotion after Mr. Hamza left the Company, despite the fact that she had completed leadership training almost two years prior.

36.     Defendant's own Executive Leadership webpage is illustrative: there are no female executives in Defendant's organization.[1]

37.     Based on Plaintiff's observations and those shared with her from other female employees, Defendant created two different workplaces for male and female employees in terms of performance standards, application of Company policy, and opportunities for advancement.

38.     For example, male employees, and especially male executives, were routinely given the opportunity to continue their employment with the Company, even after having multiple human resources issues or complaints filed against them by female employees.

---

[1] *See* Executive Leadership, https://about.dish.com/executive-bios (November 22, 2024).

39.     For instance, on at least one occasion, a male Senior Vice President, Kevin Covell, yelled at a female employee, Elizabeth Hoopes, in the workplace lobby in front of other employees. Mr. Covell is relatively tall, and he towered over Ms. Hoopes, who is petite, while yelling at her, subjecting her to physical discomfort and intimidation, as well as the humiliation of being inappropriately reprimanded by an executive in front of her colleagues.

40.     Rather than being held accountable for his physically intimidating and inappropriate behavior toward a female employee, Defendant gave Mr. Covell the benefit of a backroom handshake deal with another male executive, meaning his conduct was completely swept under the rug and no disciplinary action was taken against Mr. Covell.

41.     As further examples of Defendant's "boy's club" culture, male employees were generally given broad leeway to violate Company policy without any negative consequences, whether their violations were formally reported to human resources or not.

42.     In contrast, throughout the time Plaintiff worked for Defendant, she and other female employees were subjected to insulting nicknames and jokes targeting their gender, belittled and intimidated, denied promotions, and held to vastly different standards because of their sex.

43.     For example, during Defendant's annual Leadership Forum, an offsite planning event at which Brian Neylon, a Senior Vice President; Eric Carlson, Defendant's Chief Executive Officer (CEO); and Jay Roth, Defendant's Chief Marketing Officer (CMO) were all present and within earshot, Amir Amhed, the Senior Vice President of Sales, derogatorily referred to Plaintiff as "princess."

44.     As none of Defendant's executives present at the meeting, including the Company's CEO, said anything to Mr. Ahmed about his discriminatory comments or attempted to intervene

to prevent Mr. Ahmed from continuing to engage in discriminatory behavior toward Plaintiff, Plaintiff reasonably believed it was futile to report the comments to human resources, as Defendant's leaders at the highest levels had already demonstrated that they were accepting of Mr. Ahmed's discrimination toward Plaintiff because she is female.

45.    Encouraged by the failure of Defendant's leadership to hold him accountable, Mr. Ahmed continued to derogatorily refer to Plaintiff as "princess" on several other occasions, including within earshot of Plaintiff's direct reports on at least one occasion, which undermined Plaintiff in front of her team because she is female.

46.    Furthermore, during a rehearsal for a presentation for Defendant's Team Summit, John Swieringa, who was Defendant's Chief Operations Officer (COO) and Group President of Retail Wireless, asked a female Art Director, Lauren Cutler whether he should say "size does matter" with regards to the size of a phone that was a part of his presentation, while laughing at the obvious sexual innuendo. Ms. Cutler told Mr. Swieringa that she did not think he should make the comment during his presentation.

47.    While continuing to rehearse his presentation in front of other male executives and Ms. Cutler, Mr. Swieringa made the inappropriate comment again and asked whether he could use it during his presentation. No male executives present at the rehearsal asked Mr. Swieringa to stop making inappropriate comments that violated Defendant's EEO policy.

48.    Ms. Cutler subsequently told Plaintiff that she felt it would not matter—i.e., would be futile—to report Mr. Swieringa's inappropriate comment to human resources, because Mr. Swieringa was himself a senior executive, and he had made the comment in front other executives, who had done nothing to prevent or rectify Mr. Swieringa's behavior.

49.    Based on Plaintiff's observations and those shared with her from other female employees, Defendant's human resources (HR) department was recognized by female employees as being unsupportive and failing to take appropriate or prompt action to address reported concerns regarding sex-based discrimination and other issues affecting female employees.

50.    For example, another female employee reporting to Mr. Hamza, Ms. Hoopes, reported Mr. Hamza to human resources for repeatedly belittling her and overlooking her for promotions because she is female.

51.    In response, Defendant's HR representative told Ms. Hoopes it would "serve no purpose" to bring an HR representative to a meeting with Mr. Hamza, and Defendant took no corrective action in response to Ms. Hoopes' reports.

52.    In 2017, Defendant terminated Mr. Hamza for reasons unrelated to Ms. Hoopes' reports.

53.    Furthermore, Plaintiff had a female direct report, Pauline Grignon, who was pregnant and suffering from pregnancy-related complications. Ms. Grignon reported her pregnancy-related illness to Defendant's "HR Leaves" team and requested the temporary accommodation to work from home for the remainder of her pregnancy.

54.    When Defendant's HR department did not respond to Ms. Grignon, Plaintiff complained to HR on Ms. Grignon's behalf and requested she be approved to temporarily work from home. Defendant's HR department likewise did not respond to Plaintiff.

55.    Finally, after HR ignored both Ms. Grignon and Plaintiff, Plaintiff elevated her report to Brian Neylon, a Senior Vice President who oversaw Defendant's marketing department.

56.     Although Ms. Grignon had requested to work from home for the definite duration of eight weeks, Mr. Neylon only approved her request for two weeks without providing any rationale for his decision to deny her the ability to work from home for the remainder of her pregnancy.

57.     In these instances, as in others, complaints to HR were futile in light of the Company's deference toward its male executives' preferences and desires, and its selective enforcement of its EEO Policy that adversely impacted female employees like Plaintiff.

58.     As a result of the perceived failure of Defendant's HR department to take seriously the discrimination reported by Defendant's female employees, many female employees opted to leave the Company rather than to continue to attempt to speak up about their discrimination concerns.

59.     Defendant's culture of discrimination toward female employees because of their sex directly affected Plaintiff's career track as a leader within Defendant's organization, as set forth herein above, ¶¶ 32-35.

60.     Furthermore, in or around February 2018, as set forth herein above, Ms. Hoopes was verbally attacked in the Company's lobby by Kevin Covell, Vice President of Customer Marketing and Retention.

61.     Due to Defendant's HR department's response to Ms. Hoopes' prior report concerning discrimination by Mr. Hamza, Ms. Hoopes believed it was futile to report Mr. Covell to HR concerning the incident.

62.     Plaintiff reported the incident to Mr. Roth, who assured Plaintiff he would go to HR to address the situation.

63.    Defendant's Equal Employment Opportunity (EEO) Policy states, in relevant part:

Every supervisor who learns of any employee's concern about conduct in violation of this policy, whether a formal complaint or informal complaint, or who is otherwise aware of conduct in violation of this policy <u>must promptly</u> report the issues raised or conduct observed to senior management (their department Director or Vice President, or, if the supervisor is a Vice President, to the department Executive Vice President) and to their HR Business Partner.

64.    In violation of Defendant's EEO Policy, Mr. Roth did not report the incident with Mr. Covell to Defendant's HR department.

65.    Instead, Mr. Roth offered an informal handshake agreement to Mr. Covell to resolve the situation and sweep it under the rug.

66.    Mr. Covell never received any discipline related to this incident.

67.    Again, Defendant's EEO Policy was both ineffective and futile in correcting gender-based behavior when Defendant, often through its male executives, selectively enforced its EEO Policy to the benefit and detriment, respectively, of male and female employees.

68.    Mr. Covell remains employed with Defendant and is now a Senior Vice President.

69.    Mr. Roth went on to become the CMO for both Defendant and Defendant's subsidiary, Sling TV.

70.    In 2019, as the OneTen team under Plaintiff's leadership continued to grow and establish itself as a valuable part of the Company's infrastructure, another male Director found himself to be the subject of reports of gender-based discrimination.

71.    Brad Stamulis, the Director of Digital Marketing, had a long history of complaints made against him to both human resources and executive leadership for abusive behavior toward

female colleagues and discriminatory treatment of female direct reports, including complaints that occurred prior to his promotion to Director.

72.     However, unlike Plaintiff, Mr. Stamulis was not required to complete the Climb or Base Camp training programs prior to being promoted to a Director-level position.

73.     At one point, after Mr. Stamulis had already been promoted to Director of Digital Marketing, he became overly intoxicated at a Company-sponsored event, where he was representing Defendant as a leadership employee, and threw up on the floor in a rental property he was sharing with several other employees.

74.     Furthermore, despite being reported to HR numerous times for discrimination toward female employees and various violations of Company policy, including Defendant's EEO Policy, Mr. Stamulis was not terminated, but was given the opportunity to receive executive coaching and allowed to keep his job.

75.     Mr. Stamulis was not terminated as result of his violations of Company policy, and he ultimately left the Company for another opportunity of his own volition.

76.     As a result of Defendant's failure to hold male employees such as Mr. Covell, Mr. Hamza, and Mr. Stamulis accountable in any way, even after they had been repeatedly reported to HR for conduct indicating a discriminatory prejudice targeting and/or disparate impact toward the Company's female employees, Plaintiff reasonably believed it was futile, at best, to report concerns involving gender-based conduct to HR. Given DISH's selective enforcement of its EEO Policy and its deference toward male employees, female employees, including Plaintiff, reasonably feared they would be retaliated against for making protected reports of gender-based discrimination to HR.

77.     During the 2020 COVID-19 pandemic, Plaintiff and her team worked around the clock to promote Sling TV. Erik Carlson, who was then the Company's Chief Executive Officer ("CEO"), credited Plaintiff and her team with saving the Sling TV business from going under.

78.     Nonetheless, when Plaintiff was considered for a promotion to a Vice President position in early 2022, the promotion was denied, and the discussions around promoting her never resumed.

79.     In or around April 2022, during a meeting for which Plaintiff was not present, Plaintiff's team was brainstorming names for a character that Defendant wanted to use in an advertising campaign.

80.     One of Plaintiff's direct reports, Steve Molnar, suggested using names with hidden meanings, and he illustrated his idea with an example. Before throwing out the name, Mr. Molnar prefaced it by saying "this is inappropriate and I'm not suggesting we use it, but I'm going to say it," and he presented "Mike Ockslong" as an example.

81.     Another one of Plaintiff's direct reports, Lizzy Bakhaus, subsequently told Plaintiff about Mr. Molnar's use of the inappropriate name as an example during this meeting.

82.     During their conversation, Ms. Bakhaus specifically told Plaintiff that she was "not personally offended" by the comment.

83.     At no point did Plaintiff ever direct Ms. Bakhaus not to make a report to HR.

84.     Plaintiff immediately reported the comment to Larry Frankel, Senior Vice President of Marketing, who was at that time her direct supervisor.

85.     In response, Mr. Frankel instructed Plaintiff not to report the incident to human resources, because, in Mr. Frankel's words, "Steve is a good guy," and Mr. Frankel wanted to speak to him personally rather than asking HR to investigate the incident.

86.     Following Plaintiff's report, Mr. Frankel did not report the incident to his HR Business Partner, nor did he report it to his direct supervisor.

87.     Following Plaintiff's report to Mr. Frankel, Mr. Molnar and Ms. Bakhaus discussed the comment amongst themselves. Mr. Molnar apologized, and Ms. Bakhaus reiterated several times that she had not been personally offended by Mr. Molnar's comment, but that her goal was to "protect the leadership team."

88.     In or around September 2022, Mr. Frankel left the organization and Mr. Neylon took over leadership of Defendant's marketing department. When Mr. Neylon took over, for a brief period of time, all the marketing leaders reported to him, including Plaintiff.

89.     However, shortly thereafter, Mr. Neylon changed the reporting structure of the marketing department, such that only male Directors reported directly to him. Mr. Neylon assigned the female Directors to report to Kurt Simon, Vice President of Brand Marketing.

90.     No legitimate, non-gender-based reason existed for this reporting structure; rather, Mr. Neylon simply preferred interacting with his male subordinates.

91.     When Mr. Simon became Plaintiff's direct supervisor, the two discussed the performance of Plaintiff's direct reports.

92.     When the two reached discussion of Mr. Molnar, Mr. Simon stated, "I do not care about how thick his HR file is, let's discuss his performance."

93.     The Company ultimately decided to terminate Mr. Molnar's employment for performance reasons, not because of the inappropriate comment he had made.

94.     When Defendant terminated Mr. Molnar, he was given a 90-day grace period to "find other employment," rather than being terminated immediately.

95.     Although Plaintiff and Mr. Simon discussed the substance of Mr. Molnar's comment and Ms. Bakhaus's response to the comment, at no point did Mr. Simon indicate a belief that Defendant's EEO Policy applied to the situation, nor that he or Plaintiff had any obligation to notify Defendant's HR department about the comment.

96.     Furthermore, following Plaintiff's discussion with Mr. Simon concerning the comment and Ms. Bakhaus's response, Mr. Simon did not "promptly report" the comment to either his supervisor *or* to his HR Business Partner, in violation of the same EEO Policy Defendant used to justify Plaintiff's termination.

97.     To add further insult to injury, according to Defendant's Position Statement provided to the Colorado Civil Rights Division, Mr. Simon himself was the one who informed Plaintiff she was being terminated for supposed violations of the EEO Policy in "failing to report credible allegations of sexual harassment promptly and properly," despite the fact that Mr. Simon himself had also failed to report the same exact allegations for longer than six months after he and Plaintiff discussed Mr. Molnar's comment.

98.     In or around spring 2023, nearly a full year later, Plaintiff became aware that a human resources investigation was ongoing related to Ms. Bakhaus's response concerning Mr. Molnar's comment.

99.    Shortly thereafter, on May 17, 2023, Plaintiff's employment with DISH was abruptly terminated, supposedly for a violation of Company policy for failure to report Mr. Molnar's comment to human resources.

100.    Unlike male employees who were terminated by DISH, Plaintiff was not given a grace period to find other work or celebrated for her overwhelming success in building the OneTen organization. She was simply told that May 17, 2023 was her final day working at the Company.

101.    In fact, Plaintiff was treated worse than even Mr. Molnar, the employee who had actually made the offensive comment; he was not ever considered for termination for making the comment, despite the fact that Mr. Frankel, Mr. Simon, and other members of leadership were aware of the comment long prior to his ultimate termination for unrelated reasons.

102.    In line with Defendant's pattern of behavior Plaintiff had witnessed throughout her tenure with the Company, DISH selectively enforced its supposed policy of terminating employees for failure to report an incident to human resources to scapegoat Plaintiff, a female employee, while excusing and ignoring the very same conduct from male executives.

103.    If Defendant's so-called EEO Policy were uniformly enforced in a manner reasonably intended to eradicate gender-based discrimination in the workplace, Defendant would have had to terminate Mr. Roth, Mr. Frankel, and Mr. Simon, in addition to many others who engaged in blatant gender discriminatory behavior in violation of Defendant's EEO Policy and were repeatedly reported to HR, including Mr. Stamulis, Mr. Hamza, and Mr. Covell.

104.    In the larger context of the myriad ways in which male employees violated Company policy with impunity, Plaintiff's failure to report a comment to human resources— which, in Ms. Bakhaus's own words, she was "not personally offended" by—and which occurred

over a year before Plaintiff's termination, does not even come close to the behaviors deemed
acceptable for male employees.

105.    In fact, the male supervisors to whom Plaintiff *did* report the comment, Mr. Frankel
and Mr. Simon, were never disciplined for failing to report *the exact same incident* to human
resources that the Company used as a justification for terminating Plaintiff, despite that fact that
they were purportedly equally obligated to do so by Defendant's Employee Conduct Policy.
Though Mr. Frankel left the Company before Defendant's purported investigation, Mr. Simon
remains employed long after the investigation was concluded.

106.    Simply put, a male employee would not have been terminated for engaging in the
same purported violation of Defendant's policy as Plaintiff.

107.    Rather, Plaintiff's situation was handled differently, because women are not valued
equally to men within Defendant's organization, and are therefore held to vastly different standards
because of their sex.

**<u>FIRST CLAIM FOR RELIEF</u>**
**Discrimination based on Sex in Violation of Title VII of the Civil Rights Act of 1964 ("Title
VII"), 42 U.S.C. § 2000e *et seq.***

108.    Plaintiff incorporates by reference all paragraphs in this Complaint as if fully and
separately set forth herein.

109.    At all times relevant, Defendant was Plaintiff's "employer." 42 U.S.C. § 2000e(a).

110.    At all times relevant, Plaintiff was Defendant's "employee." 42 U.S.C. § 2000e(f).

111.    Title VII makes it "an unlawful employment practice for an employer […] to
discharge any individual, or to other discriminate against any individual with respect to [her]

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

112.    As a female, Plaintiff is a member of a protected class under Title VII on the basis of her sex.

113.    At all times relevant to this Complaint, Plaintiff was qualified for her position as the Director of OneTen.

114.    Defendant discriminated against Plaintiff in the terms, conditions, and/or privileges of her employment on the basis of her sex by holding Plaintiff to more stringent terms and conditions of employment as compared to male employees. Specifically, male employees were allowed to violate Defendant's policies with impunity, including the very same EEO Policy Defendant used to justify Plaintiff's termination. While Plaintiff was terminated, purportedly for failure to report a comment to Defendant's human resources department, Plaintiff's male supervisors, who also failed to report the *same comment* faced no discipline for their failure to do so, much less termination.

115.    Furthermore, Defendant's male employees were given warnings, placed on performance improvements plans, and/or given the opportunity to engage in performance coaching when they violated Defendant's policies, rather than being terminated—if they were disciplined at all. Plaintiff was given no such opportunity.

116.    Plaintiff was subjected to a further adverse employment action when Defendant terminated Plaintiff because of her sex.

117.    Defendant's above-described conduct was done with malice or reckless indifference to Plaintiff's federally protected rights.

118.    As a direct and proximate cause of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and she is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor against Defendant and order the following relief as allowed by law:

A.    Plaintiff's economic damages, as established at trial;

B.    Compensatory damages including, but not limited to, those for past and future pecuniary and non-pecuniary losses, emotional distress, pain, inconvenience, mental anguish, and loss of enjoyment of life;

C.    Punitive damages for all claims as allowed by law;

D.    Attorneys' fees and costs of this action;

E.    Pre-judgment and post-judgment interest at the highest lawful rate; and

F.    Such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all issues so triable.

Respectfully submitted this 27th day of November, 2024.

**HKM EMPLOYMENT ATTORNEYS LLP**

By: *s/ Abby Zinman*
Shelby Woods #48606
Abby Zinman #57792

HKM Employment Attorneys LLP
518 17th Street, Suite 1100
Denver, Colorado 80202
720.235.0105
swoods@hkm.com
azinman@hkm.com
*Attorneys for Plaintiff Nancy Perales*